# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**UNITED STATES OF AMERICA, ex rel. L. BROWN,**

**Plaintiff-Relator,**

**-vs-** **Case No. 6:06-cv-1943-Orl-22KRS**

**WALT DISNEY WORLD CO., and REEDY CREEK IMPROVEMENT DISTRICT,**

**Defendants.**

---

# ORDER

## I. INTRODUCTION

This is a qui tam action brought pursuant to the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq*.[1] The United States has declined to intervene. The Defendants, Reedy Creek Improvement District ("Reedy Creek" or "District") and Walt Disney World Company ("WDW") seek dismissal on a number of grounds. Upon carefully considering the parties' submissions and following a hearing held on June 5, 2008, the Court determines that it lacks subject matter jurisdiction over this action. Accordingly, the case will be dismissed.[2]

---

[1]Apparently, it is uncontested that Relator "L. Brown" is the daughter of Relator's principal attorney in the case, Raphael Musicus. The Defendants assert that Mr. Musicus fell at Disney and injured himself, and they argue that his resulting personal injury claim is the real motivation underlying this FCA suit. The Defendants also point out that Relator herself has no apparent connection to Disney and is thus not the typical "insider" relator usually encountered in FCA cases.

[2]In light of its ruling regarding subject matter jurisdiction, the Court need not reach the Defendants' other dismissal arguments.

## II. BACKGROUND

Reedy Creek Improvement District is a governmental entity that the Florida legislature created in 1967. The Walt Disney World Resort is situated within the boundaries of the District.

In 1988, Reedy Creek entered into a contract with the U.S. Postal Service to operate a post office in Lake Buena Vista, Florida. Lake Buena Vista is a municipality located within the District. Reedy Creek receives payments from the Postal Service pursuant to the contract. WDW was not a signatory to the agreement.

Relator's Amended Complaint consists of two counts. In her first claim, Relator contends that Reedy Creek made two misrepresentations in connection with the 1988 contract: (1) that segregated facilities were not maintained for WDW's employees and (2) that Reedy Creek did not have a parent company. In her second claim, Relator maintains that the Reedy Creek official who signed the 1988 contract misrepresented that Reedy Creek's Board of Supervisors was "duly authorized" to approve the contract. Relator contends the Board of Supervisors was not duly elected and therefore had no authority to enter into the contract, with the result that the contract is void.

Regarding the first claim, the 1988 contract contained a "Certification of Nonsegregated Facilities," which stated:

> By the submission of this offer, the offeror [Reedy Creek] certifies that he does not maintain or provide for his employees any segregated facilities at any of his establishments, and that he does not permit his employees to perform their services at any location, under his control, where segregated facilities are maintained. He certifies further that he will not maintain or provide for his employees any segregated facilities at any of his establishments, and that he will not permit his employees to perform their services at any location, under his control, where segregated facilities are maintained. The offeror or subcontractor agrees that a breach of this certification is a violation of the Equal Opportunity Clause in this contract. As used in this certification, the

> term "segregated facilities" means any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms, and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, or national origin, because of habit, local custom, or otherwise.

(Def. Ex. 6) (alteration added.)[3]

Relator contends Reedy Creek knowingly made a false statement when it certified that it did not segregate housing facilities. However, Relator does not contend that Reedy Creek segregated housing for its own employees; rather, she contends the false certification pertained to housing WDW furnished for its employees. Central to this position is Relator's contention that WDW was Reedy Creek's "subcontractor" as that term is used in the nonsegregation certification. Based on that assertion, Relator maintains that the nonsegregation certification applied to employees of both Reedy Creek and WDW. This aspect of Relator's FCA claim also rests on the proposition that the Defendants accomplished the alleged housing segregation by having Reedy Creek de-annex residential living facilities following their construction, something that allegedly reduced the number of minorities within the district.

The contract between Reedy Creek and the Postal Service also contained a certification regarding parent companies. In that regard, the document asked, "Is the offeror owned or controlled by a parent company as described below?" (Def. Ex. 6.) The form explained,

> For the purpose of this offer, a "parent company" is defined as one which either owns or controls the activities and basic business policies

[3]Citations to "Def. Ex. _" refer to the exhibits attached to the Declaration of Brent R. Bickley. (Doc. No. 39.)

> of the offeror. To "own another company" means the parent company must own at least a majority (more than 50 percent) of the voting rights in that company. To "control another company," such ownership is not required; if another company is able to formulate, determine, or veto basic business policy decisions of the offeror, such other company is considered the parent company of the offeror. This control may be exercised through the use of dominate [sic] minority voting rights, use of proxy voting, contractual arrangements, or otherwise.

(*Id.*) Reedy Creek answered this question, "no." (*Id.*) Relator contends this was a false statement because WDW is in fact the "parent"of Reedy Creek.

Regarding Relator's second claim - alleging that Reedy Creek misrepresented that its Board of Supervisors had authority to enter into the contract - Relator contends that the manner in which the Board of Supervisors held office violated the Reedy Creek Improvement District Enabling Act and the Florida Election Code. The Enabling Act essentially provides that Reedy Creek is governed by a Board of Supervisors, consisting of five owners of land within the District. (Def. Ex. 2, § 4(1).) In electing the Supervisors, each landowner within the District is entitled to one vote for every acre of land and for every major fraction of an acre owned by that landowner within the District.[4] (*Id.*, § 4(5).)

According to Relator, WDW's grants of five acres to each Supervisor to qualify them to hold office are void because (1) the grants violate the Florida Election Code in the sense that they constitute a practice different from residents otherwise qualified, who have no opportunity to acquire land in Reedy Creek, and (2) having been given for little or no consideration, they constitute unlawful

---

[4]Relator contends the definitions section of the Enabling Act defines landowner as the owner of a "freehold estate." That page of the Act is not included in the excerpts filed with the Court. However, whether the Act contains a freehold estate requirement does not affect subject matter jurisdiction.

gratuities. Additionally, Relator contends the Enabling Act's "freehold estate" requirement for a Supervisor to hold office is not met because a WDW affiliate holds an option to re-purchase the land from the Supervisor at any time. Relator also maintains that the Enabling Act's "one acre - one vote" scheme violates the principle of "one person - one vote."

## III. THIS COURT LACKS SUBJECT MATTER JURISDICTION UNDER THE FCA'S PUBLIC DISCLOSURE BAR

The FCA's public disclosure jurisdictional bar provides as follows:

> (A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> (B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4)(A) & (B).

The Supreme Court has made clear what the statute makes plain: the public disclosure bar is a matter of subject matter jurisdiction. *Rockwell Intern. Corp. v. United States*, 127 S.Ct. 1397, 1405-06 (2007). Further, because the Defendants' jurisdictional challenge is a factual attack supported by evidentiary materials, Relator has the burden of proving that subject matter jurisdiction exists.[5] *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).

---

[5]Even if the Defendants bore the burden of establishing the absence of jurisdiction, the outcome would be the same, since the Defendants have met that burden.

The Eleventh Circuit "uses a three-part inquiry to determine jurisdiction over an FCA claim based on publicly disclosed information: (1) have the allegations made by the plaintiff been publicly disclosed; (2) if so, is the disclosed information the basis of the plaintiff's suit; (3) if yes, is the plaintiff an 'original source' of that information." *Battle v. Bd. of Regents for Ga.*, 468 F.3d 755, 762 (11th Cir. 2006) (citation and some internal quotation marks omitted). Moreover, "[t]he FCA is most naturally read to preclude suits based in *any part* on publically disclosed information." *Id.* (same) (emphasis in original). "Therefore, a plaintiff basing an FCA qui tam claim *in any part* on such publicly disclosed information must demonstrate that the plaintiff is an original source of that information." *Id.* (emphasis added).

This Court concludes that the public disclosure bar applies here.

The only circumstance that Relator has identified to support her contention that Reedy Creek's 1988 certification regarding non-segregated housing was false is that the Defendants allegedly practiced discrimination by de-annexing property on which residential housing was constructed. Moreover, the only specific such incident Relator identifies is a de-annexation that occurred in 1990.[6] This transaction is central to Relator's FCA claim. Regarding this incident, the Amended Complaint alleges, in a section entitled "DISNEY SEGREGATES HOUSING FOR EMPLOYEES":

> 62. The population history of [The City of Lake Buena Vista], per the U.S. Census count, is as follows:
>
> > (a) In 1970 . . . 12; in 1980 . . . 98; in 1990 . . . 1,776; in 2000 . . . 16[.]

[6]For present analytical purposes, the Court will disregard any concerns about Relator's reliance on a transaction that occurred in 1990 to establish the falsity of a statement made in 1988.

> (b) The 1,776 persons of Buena in 1990 resided primarily in Vista Way Apartments, under the control of [WDW]. This complex consists of over 400 housing units, which opened for occupancy in 1988. This housing complex is restricted to employees, including interns, primarily of [WDW]. None of the residents in Vista Way Apartments were ever given an opportunity to vote in Buena or [Reedy Creek].
>
> (c) The decreases in Buena's population and elimination of minorities were accomplished by de-annexations. In 1990, *Disney* began de-annexation of Vista Way Apartments, 13501 Meadow Creek Drive, Orlando, FL 32821. As a result, all remaining black persons, Hispanics, and others of a minority race, were removed from Buena. The U.S. 2000 Census of Buena discloses that all permanent residents are white. No black persons, Hispanics, or others of a minority race, remain to date in Buena.

(Doc. No. 25, ¶ 62) (emphasis in original) (alterations added.)

The allegation that the Defendants had a routine practice of de-annexing residential housing parcels has been the subject of newspaper articles for many years. (Def. Exs. 15, 16 & 17.) Further, the 1990 de-annexation in particular has been disclosed in public sources that qualify as "news media." (Def. Exs. 12 (Wikepedia website);[7] 25-31 (legal notices published in newspaper)).[8] Similarly, the suggestion that WDW controls Reedy Creek has long been bandied-about in the press, (Def. Exs. 17, 39, 40, 76, 81), and has even been the subject of a court opinion issued by another judge in this judicial district, (Def. Ex. 36.) These materials, too, qualify as public disclosures of the

---

[7]The internet can qualify as "news media" within the meaning of § 3730(e)(4)(A). *United States ex rel. Unite Here v. Cintas Corp.*, No. C 06-2413 PJH, 2007 WL 4557788 at *12 (N.D. Cal. Dec. 21, 2007).

[8]Additionally, the population figures upon which Relator's allegations of segregated housing are based are publicly disclosed in census reports.

kind listed in § 3730(e)(4)(A). Finally, regarding the "lack of authority" issue, the manner in which Reedy Creek's Supervisors are elected, the "one acre - one vote" mechanism, the assertedly "token" nature of the land grants to the Supervisors, Disney's exclusive re-purchase option, and Disney's alleged de facto control over the election process have also been publicly disclosed in the news media. (Def. Exs. 17, 64, 65, 72 & 73.) Almost all of these same matters have also been disclosed in a state agency report (Def. Ex. 46.)

In the face of this evidence, Relator counters with an unusual argument: she maintains that some of her allegations are based on information contained in a book, and she argues that a book does not qualify as a public disclosure because it is not among the sources listed in § 3730(e)(4)(A). The book in question is *Married to the Mouse*, by Richard Foglesong; it was published in 2001 by the Yale University Press. In her opposition legal memo, Relator states that this book "discloses Disney was previously warned that Disney's acts depriving residents of their right to vote are unconstitutional." (Doc. No. 44 at 2) (emphasis omitted.) Later in that same brief, Relator quotes the excerpt from the book upon which she relies. To paraphrase, the quoted portion discusses a 1966 memo from attorney Paul Helliwell to Walt Disney and other top company officials, supposedly outlining the voting and control problems associated with allowing permanent residents on Disney property, as well as Walt Disney's reaction (to the effect that there should be no permanent residents within the Disney community). (*Id.* at 16-18.)

At oral argument, Relator's counsel indicated that the present lawsuit is based in significant part on this book. In fact, Relator places so much importance on this source that she characterizes it as "The Smoking Gun" (Doc. No. 44 at 2.) Concerning Relator's position that a book cannot constitute a public disclosure because it is not among the types of sources listed in § 3730(e)(4)(A),

the Defendants reply that this particular book does qualify under the "news media" category.[9] However, the Court need not decide the question of whether a book of this type can qualify as a "news media" source. For even if Relator does base some aspects of her lawsuit on this book, as previously discussed, other allegations and transactions upon which her lawsuit is founded have been publicly disclosed within the meaning of § 3730(e)(4)(A). To reiterate, Eleventh Circuit decisional authority is quite clear that the jurisdictional bar applies if *any part* of an FCA claim is based on publicly disclosed information. *Battle*, 468 F.3d at 762. That is precisely the circumstance here.[10]

Based on the foregoing, it is quite clear that a significant part of the allegations and transactions upon which Relator's FCA claims are based have been publicly disclosed. Further, by no stretch of the imagination can Relator be considered an "original source." Since this Court lacks subject matter jurisdiction if *any part* of an FCA claim is based on publicly-disclosed allegations and transactions, dismissal of this suit is mandated.

## IV. CONCLUSION

Based on the foregoing, it is ORDERED as follows:

1. The Defendants' Joint Motion to Dismiss (Doc. No. 38), filed on April 21, 2008, is GRANTED.

---

[9]Specifically, the Defendants maintain that Foglesong's book qualifies under the "news media" category of public materials on the asserted basis that "(1) it is an academic work . . . ; (2) it expressly relies on articles and other 'news media' sources; and (3) it received publicity and was itself extensively discussed in the 'news media.'" (Doc. No. 47 at 3-4.)

[10]Additionally, an abbreviated version of the matters discussed in the book excerpt - the memo from the attorney and Walt Disney's reaction - was also reported in a Washington Post article written by the same author. (Def. Ex. 14.) Unquestionably, that article qualifies as a public disclosure via the news media.

2. This case is DISMISSED, WITH PREJUDICE.

3. The Clerk shall close the case.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida on June 24, 2008.

Copies furnished to:

Counsel of Record
Unrepresented Party

ANNE C. CONWAY
United States District Judge